IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal Action Number 3:07CR322 |
| RAY PROSISE, | |
| Defendant. | |

## **MEMORANDUM OPINION**

This matter is before the Court on the defendant's motion to suppress. For the reasons stated herein, the motion to suppress will be denied.

### **I. FACTS**

The Court makes the following findings of fact. Since 2005, the defendant, Ray Prosise ("defendant" or "Prosise") had been the subject of an on-going investigation into alleged drug distribution. Law enforcement had interviewed more than six different informants or witnesses who had provided information about the defendant's alleged activities over a period of approximately two years. An informant referred to herein as Confidential Source ("CS") provided information to law enforcement in August 2007. He told law enforcement that he had assisted the defendant in transporting kilogram quantities of cocaine in the past, and he provided specific information regarding activities that had taken place at various locations. On August 16, 2007, the CS told law enforcement that Prosise was going to North Carolina to pick up multiple kilograms of cocaine and transport it back to Virginia in Prosise's green Suburban. Numerous conversations took place on August 16 and 17 between the CS and law enforcement, as the CS continued to update law enforcement on Prosise's alleged activities.

Several law enforcement agencies were involved in the investigation, including agents from the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATFE), agents from the Drug Enforcement Agency (DEA), members of the Richmond District Office High Intensity Drug Trafficking Area Task Force (TF), and members of the Sussex County, Virginia Sheriff's Department. On the morning of August 17, law enforcement received new information from the CS regarding Prosise's whereabouts, including information that the defendant had returned from North Carolina with a quantity of cocaine, that he was armed with a .40 caliber Glock handgun with a laser sight and another handgun, and that he was at the residence of his wife/girlfriend[1] at 18813 Manson Church Road, McKenney, Virginia. After receiving that information, a group of law enforcement officers, including officers and agents from the ATFE, DEA, TF, and Sussex County Sheriff's Department, gathered near the residence at 18813 Manson Church Road, McKenney, Virginia, waiting while another officer and personnel in the U.S. Attorney's Office prepared documents to obtain a federal search warrant for that residence and another used by the defendant. The CS had also reported that it was anticipated that the defendant would remain at that residence until approximately 11:00 a.m. Based on that information, law enforcement had located the defendant's green Suburban at 18813 Manson Church Road, McKenney, Virginia. Law enforcement then developed a plan to stop the defendant in his vehicle if he left the residence before the search warrants were signed and executed. This plan was communicated to the various law enforcement officers, and the officers positioned themselves and their vehicles to carry out the plan.

At approximately 11:45, the defendant left the residence. The officers moved into

---

[1] The record at this time is not clear as to whether the residence is that of a wife or girlfriend of the defendant.

2

position with two vehicles, driven by TF Officer Talbert and TF Officer Layman, blocking Lew Jones Road approximately one mile from where the defendant turned right onto Lew Jones Road from Manson Church Road.  TF Supervisor Blackwood, who was driving a vehicle that was positioned immediately in front of the defendant on Lew Jones Road at a speed of approximately 25 m.p.h., activated his emergency lights, and began to slow down.  DEA Agent Montgomery, who was driving a vehicle that was immediately behind the defendant's vehicle, moved in closer to the defendant's vehicle.  The defendant moved his vehicle from side to side, attempting to get around Blackwood, but Blackwood slowed down even more, stopped, and then reversed slowly, attempting to contain the defendant's vehicle.  At the same time, Montgomery tried to assist with vehicle containment from the rear and inadvertently bumped the defendant's car's rear bumper.  The defendant then accelerated, turned left, and hit the rear driver's side of Blackwood's vehicle.  See Gov't Exhibits 2,6, 14 & 15 (showing the damage to Blackwood's vehicle and the defendant's vehicle).  The defendant then drove up the left side embankment of Lew Jones Road, with his right two tires in the drainage ditch and his left two tires on the top of the embankment of the road, near the fence.  He stopped briefly at the beginning of an open driveway, where he appeared to be stuck in the drainage ditch.  See Gov't Exhibits 16, 17, and 18 (showing Lew Jones Road, the fence, the drainage ditch, and the driveway); see also Def.'s Exhibits A & C (showing Lew Jones Road, the fence, the drainage ditch, and the driveway).  At this point, several officers got out of their vehicles, wearing bullet-proof vests with police insignia.  Talbert and Layman were in the driveway, directly in front of the defendant's Suburban.  Talbert and others gave commands to the defendant, identifying themselves as the police and ordering him out of the car.  As Blackwood approached the passenger door of the defendant's car, the

defendant accelerated, the engine raced, the car rose up several feet, and it headed for Talbert. As the car came toward him, Talbert fired four rounds into the passenger side rear tire and rim. <u>See</u> Gov't Exhibit 20 (showing damage to Prosise's car's passenger side rear tire and rim). The defendant made a sharp left turn into the driveway and drove across the property, followed by Blackwood and Montgomery in their vehicles. The defendant stopped at a pond, then appeared to drive purposefully straight into the pond. He disregarded the officers' instructions to come out of the vehicle, instead remaining in the vehicle and throwing what appeared to be 8 to 10 one-ounce baggies of white powder and other items out of the car into the pond for several minutes. He finally exited the passenger side window, waded ashore, and was placed under arrest. The officers retrieved the baggies and a .40 caliber Glock handgun with a laser sight from the pond just outside the Suburban's driver's side door. They also found scales in the car. <u>See</u> Gov't Exhibits 1, 5, 6, 9, 10, 12 & 19 (showing defendant's car either in the pond or with the residue from the pond visible on the car); <u>see</u> <u>also</u> Gov't Exhibits 3, 4, 7, 9, 10, 12, & 13 (showing items found either floating near the car, in the car, or in the pond near the car); <u>see</u> <u>also</u> Gov't Exhibit 11 (showing the defendant at the scene).

## II. ANALYSIS

There are several issues before the Court: (1) was there a seizure of the defendant under the Fourth Amendment, and if so, when; (2) was there reasonable suspicion based on articulable facts that criminal activity was afoot; (3) was the encounter reasonable and were the warrantless arrest of the defendant and search of his vehicle appropriate under the circumstances.

The Fourth Amendment says that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."

U.S. Const. Amend. 4. According to the United States Supreme Court:

> A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, " 'by means of physical force or show of authority,' " terminates or restrains his freedom of movement, <u>Florida v. Bostick</u>, 501 U.S. 429, 434(1991) (quoting <u>Terry v. Ohio</u>, 392 U.S. 1, 19, n. 16 (1968)), " *through means intentionally applied,*" <u>Brower v. County of Inyo</u>, 489 U.S. 593, 597 (1989) (emphasis in original).

<u>Brendlin v. California</u>, 127 S.Ct. 2400, 2405 (2007). Therefore, a person can be seized in two ways. First, if officers use means of a "show of authority" and the person complies, the person is seized. However, "there is no seizure without actual submission; otherwise, there is at most an attempted seizure." <u>Id.</u> In the case of Prosise, the officers tried to use a "show of authority," but Prosise did not comply, so he was not seized and there was only an "attempted seizure."

The second way a person can be seized is when an officer by means of physical force terminates or restrains a person's freedom of movement through means intentionally applied. According to the government, no one "intentionally applied" physical force as to Prosise, pursuant to the standard in <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 844 (1998). In <u>Lewis</u>, the Supreme Court addressed the issue of whether there was a Fourth Amendment seizure of a motorcycle passenger who was accidentally struck and killed by a police officer during a high-speed chase. The Court cited <u>California v. Hodari D.</u>, 499 U.S. 621 (1991), noting its holding that "a police pursuit in attempting to seize a person does not amount to a 'seizure' within the meaning of the Fourth Amendment." 523 U.S. at 843-44. The Court in <u>Lewis</u> also looked at other cases, including <u>Brower v. County of Inyo</u>, 489 U.S. 595 (1989). In <u>Brower</u>, the Court examined many scenarios, distinguishing between the innocent passerby, the fleeing felon and other situations. For example, if a parked police car's brake slips and the car pins an innocent

passerby against a wall, this is not a seizure, although it could be a tort. Further, even if the person pinned by the car was a serial murderer for whom an arrest warrant had been issued who was being chased by two officers, this would still not be a seizure. The Court explains that only when there is a governmental termination of freedom of movement *through means intentionally applied* is there a seizure under the Fourth Amendment. In the case of the innocent passerby, there is a governmentally-caused termination of an individual's freedom of movement but there is no "means intentionally applied." In the case of the fleeing felon, there is a governmentally-caused and governmentally-desired termination of an individual's freedom of movement but the means were not "intentionally applied" when the parked police car slipped its brake and pinned the person.

In Brower, the Court also explains that if a pursuing police car sought to stop a suspect only by the show of authority represented by flashing lights and continued pursuit, and the suspect was ultimately stopped by his loss of control of his vehicle and the subsequent crash, then he was not seized. If, however, the police car intentionally sideswiped the suspect's car, producing the crash, then the termination of the suspect's freedom of movement would have been a seizure. See Brower, 489 U.S. 596-99. Obviously, this is a fine line. After examining Hodari D. and Brower, the Supreme Court concluded in the Lewis case that there was no seizure where the suspect was accidentally struck and killed by the officer during a high-speed chase. The Brower opinion also addresses a roadblock, noting that Brower was "meant to be stopped by the physical obstacle of the roadblock – and that he was so stopped." Id. at 599. In this case, however, Prosise was not stopped by the roadblock set up by the officers. The Court also finds that Agent Montgomery's bumping of Prosise's rear bumper was inadvertent and that the

defendant caused the crash into Blackwood's vehicle. Thus, under the applicable case law, there was no seizure of the defendant until he exited his vehicle, waded ashore, and submitted to the officers.

Under Terry v. Ohio, an officer may stop and briefly detain a person for investigative purposes when there is reasonable suspicion based on articulable facts that criminal activity is afoot. Terry v. Ohio, 392 U.S. 1 (1968). Whether there is reasonable suspicion depends on the totality of the circumstances, including information known to the officer and any reasonable inferences to be drawn at the time of the stop. U.S. v. Crittendon, 883 F.2d 326, 328 (4th Cir. 1989). The government contends that, given the on-going investigation of the defendant's drug distribution activities, the historical information that had been provided, and the up-to-the minute information being provided by the CS about the defendant's illegal activities in the hours just prior to this incident, law enforcement had reasonable suspicion based on articulable facts that the defendant was engaged in criminal activity. The Court agrees. The Court need not rely on the fact that on similar facts another judicial officer found probable cause to authorize search warrants. The facts were very similar, but not precisely the same because the judicial officer had some information – specifically a statement that Prosise exited the Manson Church Road address, that a pursuit ensued, and that Prosise abandoned his vehicle in a pond where it began to sink – that was not available to the officers at the point they decided to detain Prosise. The Court also finds that the information that law enforcement had regarding the defendant was provided by numerous informants and not just a single anonymous tip from an unknown informant. See Florida v. J.L., 529 U.S. 266, 270-71 (2000). The officers had historical information provided by at least six different informants and a CS who was providing up-to-the-minute information

regarding the defendant. Some of the information provided by the CS was in fact corroborated by the observations of various law enforcement officers. Accordingly, the Court finds that law enforcement had reasonable suspicion based on articulable facts that the defendant was engaged in criminal activity, sufficient to justify a <u>Terry</u> stop.

Finally, if the defendant is arguing that the stop was unreasonable or that law enforcement could not arrest the defendant or search the vehicle without a warrant, the Court disagrees. First, there were exigent circumstances because the officers reasonably believed that contraband or other evidence could be destroyed or removed from the vehicle before a search warrant could be obtained. In fact, it appears that the removal and destruction of evidence was the defendant's intention when he drove purposefully into the pond. Second, there was probable cause to believe that a crime or crimes had been committed to justify a warrantless arrest following the pursuit and the actions of the defendant that the officers had witnessed. Next, following a lawful arrest of an occupant of a vehicle, officers may search the passenger compartment and any containers therein without a warrant, and they could also search the pond where the defendant had no reasonable expectation of privacy. Therefore, the Court finds that the warrantless arrest of the defendant and search of the vehicle and pond were appropriate under the circumstances.

### III. CONCLUSION

For all these reasons, the defendant's motion to suppress is denied.

An appropriate Order shall issue.

<u>November 15, 2007</u>                          <u>            /s/            </u>
DATE                                     RICHARD L. WILLIAMS
                                         SENIOR UNITED STATES DISTRICT JUDGE